UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DWIGHT CREWS and PEGGY CREWS,

        Plaintiffs,

  v.              7:12-CV-1678
                   (FJS/DEP)

AIR & LIQUID SYSTEMS CORPORATION;
ARMSTRONG INTERNATIONAL, INC.;
BW/IP INTERNATIONAL, INC., individually
and as successor-in-interest to Byron Jackson
Pumps; CARVER PUMP COMPANY; CBS
CORPORATION, formally known as Viacom,
Inc., successor-by-merger to CBS Corporation
formerly known as Westinghouse Electric
Corp.; CLARK RELIANCE CORPORATION;
CRANE CO.; ELLIOT TURBOMACHINERY
COMPANY; FLOWSERVE CORPORATION,
also known as BW/IP International, Inc., as
successor-in-interest to Byron Jackson Pumps;
FOSTER WHEELER ENERGY CORPORATION;
GENERAL ELECTRIC COMPANY; ICON
MANAGEMENT SERVICES, LLC, individually
and as successor in interest to Jerguson
Valve and Gauge Company; IMO INDUSTRIES,
INC., individually and as successor-in-interest to
Delaval Steam Turbine, Inc.; INGERSOLL-RAND
COMPANY; JOHN CRANE, INC.; NATIONAL
SERVICE INDUSTRIES, INC., formerly known
as North Brothers, Inc.; PNEUMO ABEX
CORPORATION; ROCKWELL INTERNATIONAL
CORP.; SEQUOIA VENTURES, INC. also known
as Bechtel Corporation; UNION CARBIDE
CORPORATION; WARREN PUMPS, LLC;
WEINMAN PUMP AND SUPPLY COMPANY;
and YARWAY CORPORATION,

        Defendants.
_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **NAPOLI BERN RIPKA**<br>**SHKOLNIK & ASSOCIATES LLP**<br>350 Fifth Avenue, Suite 7413<br>New York, New York 10118<br>Attorneys for Plaintiffs | **MICHAEL COHAN, ESQ.**<br>**KARDON A. STOLZMAN, ESQ.** |
| **K & L GATES LLP**<br>599 Lexington Avenue<br>New York, New York 10020-6030<br>Attorneys for Defendant Crane Co. | **ANGELA DIGIGLIO, ESQ.**<br>**ERIC R.I. COTTLE. ESQ.**<br>**NICOLE M. KOZIN, ESQ.** |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On May 21, 2012, Plaintiffs filed a complaint in New York Supreme Court, Jefferson County. *See* Dkt. No. 55 at 6; Dkt. No. 1 at Exhibit 2. On November 13, 2012, Defendant Crane Co. filed a notice of removal based on federal officer jurisdiction under 28 U.S.C. § 1442(a)(1). *See* Dkt. No. 1. On February 13, 2013, Plaintiffs filed the pending motion to remand on the ground that the Court lacked subject matter jurisdiction over this action. *See* Dkt. No. 52.

### II. BACKGROUND

Plaintiffs allege that Plaintiff Dwight Crews (hereinafter "Plaintiff") acquired cancer as a result of asbestos exposure while serving in the United States Navy from 1965 to 1971. *See* Dkt. No. 55, Plaintiffs' Remand Memorandum of Law, at 6; Dkt. No. 1 at ¶ 5. Plaintiffs assert six causes of action.[1] *See* Dkt. No. 1 at Exhibit 2. The first cause of action sounds in negligence,

---

[1] Plaintiffs originally sued twenty-three Defendants. However, only four Defendants
(continued...)

part of which is based on negligent design, *see id.* at ¶ 58, and failure to warn, *id.* at ¶¶ 64-65, against all Defendants.  Their second cause of action alleges breaches of implied and express warranties and is "against all Defendants, except for those asbestos exposures which are alleged to have occurred aboard any military vessel or vehicle, on or at any shipyard or on or at any governmental facility or location."  *See id.* at ¶¶ 77-82.  Their third cause of action asserts a failure to warn claim "against all Defendants except no claims alleging a manufacture or design defect other than failure to warn are made for any asbestos exposures, which are alleged to have occurred aboard any military vessel or vehicle on or at any shipyard or on or at any governmental facility or location."  *See id.* at ¶¶ 83-92.  Their fourth cause of action asserts a claim based on fungible products and is asserted "against all Defendants except no claims alleging a manufacture or design defect other than failure-to-warn are made for asbestos exposures, which are alleged to have occurred aboard any military vessel or vehicle, on or at any shipyard on or at any governmental location."  *See id.* at ¶¶ 93-103.  Their fifth cause of action is based on a claim of unsafe workplace and is asserted against all Defendants.  *See id.* at ¶¶ 104-122.  Their sixth cause of action is for loss of consortium.  *See id.* at ¶¶ 123-126.

Defendant Crane Co. (hereinafter "Defendant") is a small sub-manufacturer that produced valves and gaskets for the Navy during Plaintiff's time in service.  *See* Dkt. No. 1 at ¶ 5; Exhibit 2, at Response No. 22 and Chart A.  Plaintiff alleges that he was exposed to products that Defendant manufactured and supplied while working aboard the USS Wright and USS Bainbridge.  *See id.*

---

[1](...continued)
remain: (1) Crane Co.; (2) IMO Industries, Inc.; (3) Ingersoll-Rand Co.; and (4) Warren Pumps, LLC.  Of these Defendants, only Defendant Crane Co. has a pending summary judgment motion.

# III. DISCUSSION

## A. Standard for removal under 28 U.S.C. § 1442(a)

Generally, removal of an action from state court to federal court is only permissible if the action could have been brought initially in federal court. *See Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 775 (E.D. Pa. 2010) (citing 28 U.S.C. § 1441). Furthermore, a defendant usually may not remove a suit to federal court on the basis of a federal defense. *See id.* at 776 (citation omitted). However, the federal officer removal statute, 28 U.S.C. § 1442(a)(1),[2] which confers jurisdiction over cases in which a federal officer is a defendant, explicitly allows defendants to remove such actions and, thus, is an exception to this general rule. *See id.* (citations omitted).

To establish subject matter jurisdiction under § 1442(a)(1), a defendant must demonstrate that

> "(1) it is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office."

*Id.* (quoting *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998)).

---

[2] The federal officer removal statute allows the following group of defendants to remove a state action to federal court:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

In this case, Defendant raises the government contractor defense "which, based on principles of preemption, cloaks government contractors like Defendant[] from ordinary state-law liability." *Id.*

In situations such as this one, in which "the government contractor defense is the basis for invoking this Court's jurisdiction . . . against [a] non-government entit[y] who furnished equipment to the military, resolution of Plaintiff's motion to remand effectively turns on how colorable Defendant['s] federal defense really is." *Id.* Furthermore, as the court noted in *Hagen*, "unlike the analysis undertaken with respect to other removal statutes, . . . the Court must broadly construe Defendant['s] ability to remove under Section 1442(a)(1) as to avoid frustrating its policy objective of 'hav[ing] the validity of the defense of official immunity tried in a federal court' by applying a 'narrow, grudging interpretation.'" *Id.* at 777 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)) (internal citation and other citation omitted).

When addressing a motion to remand where the defendant has removed the case based on § 1442(a), the court must first determine what constitutes a "colorable" federal defense. In *Willingham v. Morgan*, 395 U.S. 402 (1969), the Supreme Court explained that

> [t]he federal officer removal statute is not "narrow" or "limited." . . . . At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law. **One of the primary purposes of the removal statute — as its history clearly demonstrates — was to have such defenses litigated in the federal courts**.

*Id.* at 406-07 (internal quotation omitted) (emphasis added); *see also Arizona v. Manypenny*, 451 U.S. 232, 241(1981) (stating that the purpose of "ensur[ing] a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties" is to permit a defendant to have its defense adjudicated in federal court (footnote omitted)); *Jefferson Cnty. v.*

*Acker*, 527 U.S. 423, 431 (1999) ("recognizing that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court'" (quotation omitted)).

In other words, an "officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407.

The Court agrees with the *Hagen* court's conclusion that, "applying the Supreme Court's clear teaching that a colorable defense need not be proven at [the remand] stage of the litigation due to the broad removal right the statute creates," *Hagen*, 739 F. Supp. 2d at 781, although the court "must require that the facts identified by the defendant support the federal defense, the Court is not called upon at this preliminary stage to pierce the pleadings or dissect the facts stated[,]" *id.* at 782.[3]

Applying the *Hagen* court's analysis to the present case, the Court must determine whether Defendant has "a colorable claim that the government contractor defense shields [it] from liability to Plaintiff." *Id.* at 783. In doing so, the Court reviews the facts in the light most favorable to Defendant without addressing the merits of the defense. *See id.* at 783-84.

---

[3] The Court acknowledges, as the *Hagen* court did, that there is a split in authority regarding the issue of what "a defendant [who is asserting a colorable federal defense under § 1442] must proffer to defeat a plaintiff's motion for remand." *Hagen*, 739 F. Supp. 2d at 777 (footnote omitted). Nonetheless, the Court finds the *Hagen* court's analysis of these differences and the reasons for its decision persuasive and, therefore, concludes, as the *Hagen* court did, that "a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial." *Id.* at 783 & n.13 (noting that, "[p]resumably, the merits of Defendants' defense will be tested on a motion for summary judgment or at trial. By allowing Defendants' defense to be resolved in this forum, the Court adheres to Section 1442(a)(1)'s clear mandate.").

**B.     Application to Plaintiff's claims**

*1. Defective design claim*

To assert a "colorable" federal defense to a design defect claim, the defendant must show that there is a significant conflict between state and federal law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).  The defendant's state tort law design duty is displaced "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.*; *In re Joint E. & S. Dist. New York Asbestos Litig. v. Eagle Picher Indus., Inc.* ("*Grispo*"), 897 F.2d 626, 629 (2d Cir. 1990) (quotation omitted).

Despite Plaintiff's contention that there is no "uniquely federal" interest at play and that the Navy did not dictate to Defendant the precise specifications, the record is to the contrary. The affidavits of Anthony D. Pantaleoni ("Pantaleoni Aff."), *see* Dkt. No. 1-5; David P. Sargent, Jr.[4] ("Sargent Aff."), *see* Dkt. No. 1-6; and Dr. Samuel Forman ("Forman Aff."), *see* Dkt. No. 3-6 demonstrate that, in this case, Defendant's state tort law design duty has been displaced.

Mr. Pantaleoni stated that the Navy provided detailed instruction in the pertinent Military Specifications ("MILSPECS").  Specifically, in Section A of the "Bureau of Engineering Specification Valves, Gate, for Air Exhaust Steam, Oil, or Water Services (Shipboard Use)," the types of packing available are delineated    33P14 (Packing, *asbestos*, valve stem, symbol 1101), 33P16 (Packing, *asbestos*, rod, high pressure, symbol 1100), and 3317 (Packing, metallic,

---

[4] David P. Sargent, Jr. is a retired Rear Admiral of the United Stats Navy.  He served from 1967 to 1999.  *See* Dkt. No. 1-6 at ¶ 1.

flexible, symbols 1430 and 1431) (emphasis added). *See* Dkt. No. 1-5 at 17. Later in the same document, D-17 states, "[v]alve stems shall be packed with one of the packings conforming to N.D. Specs. 33P14, 33P16, or 33P17, referred to in Section A." *See id.* at 20. Further, in accordance with MIL-V-22052D (SH), other specifications using asbestos are included MM-P-46 (Packing; *Asbestos*, Sheet Compressed), MIL-A-7021 (*Asbestos* Sheet, Compressed, for Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets), and MIL-P-24377 (Packing Material, *Asbestos*, Braided, Impregnated with TPE (Polytetrafluroethylenal), Surface Lubricated) (emphasis added). These MILSPECS show that, in the manufacture and delivery of Defendant's valves, the Navy directed the use of asbestos. Furthermore, Mr. Pantaleoni's affidavit makes clear that "[t]he manufacture of equipment for use on Navy vessels was governed by an extensive set of federal standards and specifications," which "governed all aspects of a piece of equipment, such as a valve's design and construction and specified the materials to be used, including materials such as gaskets and packing used in equipment." *See* Dkt. No. 1-5 at ¶ 5.

In order to demonstrate conformity with these specifications, Mr. Sargent states that "[t]he development of the contract design package involved multiple government decisions[,]" and "[t]he Navy developed specifications called, since the 1950s, Military Specifications (MILSPECs) for use in the contract design package." *See* Dkt. No. 1-6 at ¶¶ 25-26. "These MILSPECs presented very detailed descriptions of what the government required when procuring the items covered by the MILSPECs, including requirements such as chemical composition, dimensions, required testing and performance demonstrations, required labeling, packaging and shipping requirements, and similar content." *See id.* at ¶ 26. Notably, Mr. Sargent asserts that

"[c]ompliance with the standards and specifications issued for equipment supplied for ultimate use aboard Navy ships was directly monitored by Naval Machinery Inspectors" and "[e]quipment could not have been installed aboard Navy vessels unless it was first determined by the Navy to be in conformity with all applicable Navy specifications." *See id.* at ¶ 29. Lastly, Mr. Sargent states that "detailed design was typically accomplished by the construction shipyard," and "the shipyard connected an array of components such as valves . . . by adding gaskets to the flanges of each piece of equipment and piping." *See id.* at ¶ 32. Most importantly, "[w]here flange gaskets contained asbestos, *it was because the Navy required it*; the manufacturers of valves and pumps did not manufacture or supply the flange gaskets." *See id.* (emphasis added).

Finally, Dr. Forman states that the Navy possessed "state-of-the-art knowledge regarding asbestos-related health hazards" during the time period at issue here." *See* Dkt. No. 3-6, at ¶ 84. Dr. Forman's affidavit demonstrates that there was nothing about which Defendant needed to warn the navy because the Navy knew about the health hazards of asbestos after conducting studies on work health in the early twentieth century. *See Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 104 (D. Conn. 2007).

In this case, Plaintiff has presented evidence, which, if accepted as true, shows that (1) the Navy provided reasonably precise specifications; (2) Defendant's equipment conformed to those specifications; and (3) there was no need for Defendant to warn the Navy about the dangers of the use of asbestos in its products because those dangers were known to the Navy. Accordingly, the Court finds that Defendant has raised a colorable military contractor defense to Plaintiff's defective design claim.

*2. Failure to warn claim*

In the context of a failure-to-warn case, the defendant must demonstrate that

> "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not."

*Hagen*, 739 F. Supp. 2d at 783 (quoting *Tate*, F.3d at 1157) (other citation omitted).

To support its position that it has met these requirements, Defendant relies on certain MILSPECS, as well as the affidavits of Admiral Sargent and Dr. Forman. First, section 3.3.6, "Notes, Cautions, and Warnings," of MIL-M-15071D provides as follows:

> Notes, cautions and warnings should be used to emphasize important and critical instructions. The use should be as sparing as is consistent with real need. When used, notes, cautions and warnings should immediately precede the applicable instructions and shall be selected in accordance with the following definitions:
>
> (a) "NOTE"   An operating procedure, condition, etc., which it is essential to highlight.
>
> (b) "CAUTION"   Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.
>
> (c) "WARNING"   Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.

*See* Dkt. No. 3-3 at § 3.3.6.

Second, section 3.6.3.4, "System Hazards and Precautions," of MIL-M-15071H provides as follows:

> Descriptions of system hazards and precautions shall be included, addressed to system personnel and referenced to particular system

-10-

> equipment. The descriptions shall be organized to be consistent
> with the operation of the system. The descriptions shall
> supplement and extend equipment safety instructions to the system
> level, by warning of potential hazards that can be caused during
> operation or maintenance.

*See* Dkt. No. 55-16 at § 3.6.3.4.

Third, section 3.6.3.4.3, "Hazardous Components," of MIL-M-150171H provides as follows:

> Identify and briefly describe the hazardous components including
> radioactive devices and elements used with the system and
> summarize the general handling precautions for such components.
> The description of a hazardous component shall include brief
> statements as to the purpose, manner of functioning, nature of
> built-in safety devices, and nature of the hazardous element; it shall
> also indicate the relative sensitivity of the component to
> mechanical shock, vibration, electromagnetic and radioactive
> radiation, and electrostatic discharges.

*See id.* at § 3.6.3.4.3.

Although the first section of MIL-M-1507D, under 1.1, "Scope," states, in pertinent part, that "[t]he intent is to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial whenever it is roughly equivalent to the detail requirements included herein," this does not mean that the Navy defers to the manufacturer's discretion regarding warnings. *See* Dkt. No. 3-3 at § 1.1. Rather, under § 3.1.3, in MIL-M-15071D, manufacturers are permitted to submit commercial manuals for the Navy's review and subsequent approval. *See id.* at § 3.1.3. Together with § 3.3.6 of the same MILSPEC, indicates that the Navy retained final authority over the nature and content of the warnings.

In addition, Defendant relies on the affidavit of Admiral Sargent to claim it would not have been allowed to "affix[] any type of warning or caution statement to equipment intended for

installation in a Navy ship, beyond those specifically required by the navy without prior discussion and express approval by the Navy." *See* Dkt. No. 1-6 at ¶ 58. Admiral Sargent goes on to say, "the Navy would not have permitted equipment suppliers to place asbestos-related warnings on packaging or containers for valves and pumps or related parts or items supplied during the 1940s, 1950s, or 1960s." *See id.* at ¶ 63. Defendant also submitted the affidavit of Dr. Forman, in which he stated that the Navy took responsibility for the safety and welfare of its personnel and had extensive knowledge about the damages of asbestos. *See* Dkt. No. 3-6 at ¶¶ 21-35. Based on the above-cited language from the MILSPECS and the declarations of Admiral Sargent and Dr. Forman, this Court finds that Defendant has set forth sufficient facts to state a "colorable" military contractor defense against Plaintiff's failure-to-warn claim.

### 3. *"Acting under" requirement*

Since "a defendant's government contractor defense . . . is only colorable if the defendant identifies facts demonstrating the government's actions 'transcend rubber stamping,' . . . any defendant who satisfies the colorable defense requirement will necessarily meet the acting under requirement of Section 1442(a)(1) as well." *Hagen*, 739 F. Supp. 2d at 784-85. Accordingly, the Court concludes that, for the same reasons the Court determined that Defendant's federal defense is colorable, Defendant has also established that it was acting under a federal officer, thus satisfying § 1442(a)(1)'s "acting under" requirement with respect to both his design defect and failure-to-warn claim.

*4. Causal nexus requirement*

The final requirement for removal under § 1442(a)(1) is that the defendant must show that there is a causal nexus between the conduct performed under federal direction, in this case, Plaintiff's defective design and failure-to-warn claims. To satisfy this requirement, a defendant must "'by direct averment exclude the possibility that [the defendant's action] was based on acts or conduct of his not justified by his federal duty.'" *Hagen*, 739 F. Supp. 2d at 785 (quotation omitted). Furthermore, the causal nexus requirement "'is closely related to evidence supporting a colorable federal defense' where a government contractor is the defendant because both elements require the 'defendant [to] show that it acted at the federal government's command.'" *Id.* (quotation omitted). In essence, "the causal nexus analysis 'is essentially the same as [that associated with] the colorable defense requirement.'" *Id.* (quotation and footnote omitted). Accordingly, for the same reasons that the Court determined that Defendant's federal defense is colorable, the Court also finds that Defendant has established that a causal connection exists between the conduct it performed under the federal direction and Plaintiff's defective design and failure-to-warn claims.

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion to remand this case is **DENIED**.

**IT IS SO ORDERED.**

Dated: February 18, 2014
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge